THE CITY OF CHILLICOTHE, Petitioner-Appellant, v. THE ILLINOIS STATE LABOR RELATIONS BOARD *et al.*, Respondents-Appellees (Public Works Employees, Respondents).

Third District   No. 3—87—0074

Opinion filed January 7, 1988.

Edmonds, Laukitis & Mahoney, Ltd., of Chillicothe (Richard V. Laukitis, of counsel), for petitioner.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and Imelda R. Terrazino, Assistant Attorney General, of Chicago, of counsel), for respondent Illinois State Labor Relations Board.

Sonneborn & Klocke, of Springfield (Wayne M. Klocke, of counsel), for respondent Policemen's Benevolent and Protective Association of Chillicothe.

JUSTICE SCOTT delivered the opinion of the court:

This case comes on appeal from the decision and order of the Illinois State Labor Relations Board (the Board). Pursuant to Supreme Court Rule 335 (107 Ill. 2d R. 335), the petitioner, City of Chillicothe (City or Chillicothe) seeks reversal of the Board's decision that Chillicothe had engaged in unfair labor practices within the meaning of section 10 of the Illinois Public Labor Relations Act (the Act) (Ill. Rev. Stat. 1985, ch. 48, par. 1601 *et seq.*) against members of the City's Public Works Employees (PWE) and Policemen's Benevolent and Protective Association of Chillicothe (PBPA). The relevant facts are as follows.

Chillicothe has a council-mayor form of government. Since 1977, members of the city council have been appointed by the mayor to a committee to meet with representatives of city employees. The committee has had several names, including "payroll," "wage negotiation," and most recently, "employee relations committee." The mayor also in 1977 encouraged the public works employees, the police officers, the dispatchers and the office personnel to select one or two persons to attend meetings with the payroll committee. The purpose of these meetings was to discuss employee concerns and what employees would like included in a payroll package. The annual packages compiled since 1977 have covered wages, sick leave, overtime, vacation days, personal leave, longevity pay, bereavement days, clothing or uniform allowance, holidays, and call-in procedures.

The PWE is made up of two departments of Chillicothe employees, water and sewer department and road and bridge department. Each year these two departments select two representatives to meet with the City's payroll committee. The representatives at the meetings present proposed changes that the members of the PWE would like to obtain from the current payroll package. The discussions had and any counterproposals made by the payroll committee are then relayed by the representatives back to the PWE members for discussion and consideration.

The PBPA is a fraternal organization for police officers. The PBPA purposes include promoting the welfare of its members and engaging in community service programs. All sworn peace officers are eligible to join the PBPA. Members pay dues, elect officers, have adopted bylaws and meet regularly once a month. Three patrolmen

and the police chief are PBPA members out of a total of eight police officers employed by Chillicothe. William Gatlin (Gatlin) has been the president of PBPA since 1983. The PBPA president appoints representatives, subject to membership approval, to act as a negotiating committee. Members of PBPA and nonmembers are asked to provide input concerning what proposed package goals the PBPA representatives should try to obtain.

On May 15, 1986, and May 16, 1986, respectively, the PBPA and PWE filed separate unfair labor practice charges with the Board alleging that Chillicothe had refused to bargain with them in violation of section 10(a) of the Act. (Ill. Rev. Stat. 1985, ch. 48, par. 1610(a).) The cases were consolidated for hearing. At the hearings the PBPA and PWE argued generally that they were labor organizations under the Act; that they have historically represented specified bargaining units of Chillicothe employees; that they requested Chillicothe to bargain with them over wages, hours of employment and other conditions; but that Chillicothe refused to do so.

We will not go into great detail regarding the meetings between PBPA and PWE representatives and the Chillicothe payroll committee since 1977, as those details have been sufficiently stated in the Board decision. Briefly, however, in 1977 representatives from the PWE and PBPA and Chillicothe committee members met two to five times in the city hall. The employee representatives were given the opportunity to state what they would like to have included in a payroll package. Certain suggestions were made regarding wages and benefits and the City later adopted a payroll package that granted, at least in part, requests made regarding wage increases, sick leave, personal days and vacation time.

In 1978 there were three meetings between employee representatives and city council members. The substance of the meetings was similar to those in 1977. Highlights, however, include the City's adopting a payroll package incorporating the PWE's proposal that the public works employees receive a clothing allowance rather than wearing uniforms furnished by the City and that a new lead man position be created in the department. All employees also received a pay raise and were given an additional personal day rather than two extra holidays as was requested.

In the spring of 1979 similar meetings were again held on three occasions in the council chambers at city hall. PWE sought a 10% pay raise, an increase in the clothing allowance and the creation of a mechanic's position. The PBPA representative requested that peace officers receive a 1% to 2% hazardous pay raise above any other wage

increase and that Easter Sunday or Good Friday be given as an additional holiday. The subsequently adopted payroll package, although in the opinion of one alderman was not what "we agreed upon," included a 7% wage increase for all employees except policemen, who received an 8% increase, a $50 clothing allowance increase for policemen and public works employees, an additional holiday, and a new job position was created for a public works mechanic.

In 1980 and 1981 employee representatives and city council committee members met to discuss proposed changes in the upcoming payroll packages. Approximately three meetings were held each year. Topics of discussion were wages, personal days, sick leave, vacation leave, clothing allowances, holidays, cost of living and hazardous pay. In both years the payroll committee, after the meetings, submitted a proposed payroll package to the city council for approval. The council approved packages which included a 7% wage increase in two increments, one extra personal day and a change in accumulated sick leave time.

In January 1981, PBPA President Gatlin wrote a letter to Alderman Keith Johnson of the City's payroll committee indicating that the PBPA believed that the police chief had appointed Gary Fyke as employee representative. Gatlin advised that Fyke's appointment was not in the employees' best interest and that the rank and file had selected Steve Bart to negotiate on their behalf.

In 1982 the mayor called a meeting for all employees and informed them that due to the city's financial condition no money was available for pay raises or increased benefits. Thus, no meaningful meetings were held in 1983 or 1984. There were, however, discussions in 1983 and 1984 regarding employee insurance benefits. Apparently, the employees were to submit a list of desired coverages to the mayor for seeking bids from insurance carriers. The list was misplaced and nothing happened with the insurance, which promoted a letter from PBPA President Gatlin to City Alderman Pelini inquiring whether any 1984 or 1985 negotiations had been planned. Pelini responded that since the City had not heard from the employees regarding the insurance, the payroll committee had not reconvened for the purpose of negotiating a pay package. Gatlin replied that the employees had submitted a proposal and asked that the proposal be approved. No action was taken and the same insurance carrier and coverage have remained in effect.

In 1985 Mayor Irvin Latta assumed office and shortly thereafter informed all employees that he was willing to discuss a payroll package. Mayor Latta then appointed two city council members to the

"employee relations committee." Written notice was given on August 9, 1985, informing all employees that the employee relations committee was meeting on August 17, 1985, and that representatives from each department should be selected. Both the PWE and the 'PBPA were represented at the subsequent meetings. Discussions were had at these meetings regarding wages, benefits and clothing allowances and eventually a payroll package was approved by the city council in December 1985. However, the employee representatives believed that the final package was not in a form that they had agreed to. Thus, the committee met again, which resulted in amendments issued clarifying the 1985 package.

On April 24, 1986, employee representatives were notified that the employee relations committee would meet on April 28 to discuss the 1986 payroll package. Payroll packages were subsequently distributed to the employee representatives and told that there were to be no discussions concerning the new package. The PBPA and the PWE both voiced disapproval of the new payroll package. The PBPA further requested that the police officers negotiate separately with the City, apart from other employees. The PBPA received a response from the city attorney indicating that the City did not intend to acknowledge the PBPA as a labor organization or as a bargaining agent of the police officers. The PWE also received a letter from the city attorney stating that the new payroll package had been approved and the city council expected compliance with the package as enacted.

The issue presented for review is whether the State Labor Relations Board properly found that the City committed unfair labor practices by refusing to bargain with the PBPA and PWE, when·so requested, over wages, hours, terms and other conditions of employment of the City's peace officers and public works employees. To make this determination we must focus on whether the PBPA and PWE were "bargaining units in existence on the effective date of this Act" (Ill. Rev. Stat. 1985, ch. 48, par. 1620(b)) and whether the PBPA and PWE are "labor organizations which have historically represented public employees for the purpose of collective bargaining" (Ill. Rev. Stat. 1985, ch. 48, par. 1609(c)).

Chillicothe's primary assertion is that the Board has improperly relied upon section 9 of the Act (Ill. Rev. Stat. 1985, ch. 48, par. 1609) and *Village of Worth*, 2 Pub. Employee Rep. (Ill.) par. 1045, case No. S—RC—259 (Illinois State Labor Relations Board, September 24, 1986) in deciding that the PBPA and PWE were bargaining units that had been historically recognized by Chillicothe;,further, that in order to find that the PBPA and PWE were bargaining units in ex-

istence on the date of the Act, one must find that "collective bargaining," as defined by the Act, had taken place between them.

The basis of Chillicothe's claim rests primarily on section 20(b) of the Act, which states:

> "This Act shall not be applicable to units of local government employing less than 35 employees, except with respect to bargaining units in existence on the effective date of this Act." Ill. Rev. Stat. 1985, ch. 48, par. 1620(b).

The effective date of the Act for the PWE is July 1, 1984, and the effective date for the PBPA is January 1, 1986. Ill. Rev. Stat. 1985, ch. 48, par. 1603(f).

■ We agree with Chillicothe that the PBPA and the PWE are not bargaining units. The bargaining units are the police department (represented by PBPA) and the water and sewer department and road and bridge department (represented by PWE). We also agree with Chillicothe that in order for there to have been a bargaining unit in existence, there must have been collective bargaining between the parties. In order to determine whether the bargaining units named above were in existence on the effective dates of the act, we must determine whether or not the PBPA and the PWE were labor organizations which exclusively represented the respective bargaining units through an historical pattern of collective bargaining with Chillicothe. We must also determine whether the respective bargaining units were the appropriate units for purposes of collective bargaining. We agree with the Board that section 9 of the Act and *Village of Worth* are instructive for making this determination.

Section 3(i) of the Act defines a labor organization as follows:

> "(i) 'Labor organization' means any organization in which public employees participate and which exists for the purpose, in whole or in part, of dealing with a public employer concerning wages, hours, and other terms and conditions of employment, including the settlement of grievances." (Ill. Rev. Stat. 1985, ch. 48, par. 1603(i).)

In *City of Calumet City*, 2 Pub. Employee Rep. (Ill.) par. 2047, case No. S—RC—143 (Illinois State Labor Relations Board, September 24, 1986), the Board found that the Fraternal Order of Police, Calumet City Lodge No. 1 (the Lodge) was a labor organization within the meaning of section 3(i) of the Act because: (1) public employees participated in the Lodge; (2) the Lodge attempted to represent police officers regarding wages, hours and other terms and conditions of employment; and (3) one of the present purposes of the Lodge was to represent public employees in their dealings with their employer of

wages, hours, other terms and conditions of employment. (*City of Calumet*, 2 Pub. Employee Rep. (Ill.), at VIII—329.) We believe that both the PBPA and the PWE meet the statutory requirements for a labor organization, as did the Lodge in *City of Calumet*.

■ It is undisputable that members of the PBPA are public employees. The PBPA meets monthly, has adopted bylaws, elects officers, collects monthly dues and takes votes on various matters, including proposals concerning wages and benefits presented to the City's representatives by PBPA delegates. The PBPA had authorized representatives to meet with the City to discuss wages, benefits and other terms and conditions of employment. Although not all of Chillicothe's police officers were PBPA members, the evidence clearly shows that those non-PBPA police officers authorized the PBPA to represent them at negotiation meetings with the City. The end results of these meetings with the City were revised payroll packages that included increased wages, increased benefits and other changes in the packages. Moreover, certain provisions of the payroll package applied exclusively to police officers which often resulted from specific requests. The PBPA is clearly a labor organization within the meaning of section 3(i) of the Act.

■ The PWE has no formal structure. However, it is clear that the members of the PWE are public employees that had joined together to elect representatives and to discuss wages, benefits and other terms and conditions of employment. It is unclear whether or not the PWE consists of all of the employees within the water and sewer department and road and bridge department. Nevertheless, the employees collectively determined what their representatives would request at the payroll committee hearings. Consequently, the city council would approve packages that granted at least some of the requests of the PWE representatives. Nothing in the Act requires formal existence by way of membership dues or monthly meetings. In *National Labor Relations Board v. Cabot Carbon Co.* (1959), 360 U.S. 203, 3 L. Ed. 2d 1175, 79 S. Ct. 1015, the Supreme Court, when interpreting a similar definition of a labor organization within the National Labor Relations Act (29 U.S.C. §152(c)), held that an employee committee that had no membership requirements but discussed wages and working conditions was a labor organization. Accordingly, we believe that the PWE is a labor organization within the meaning of section 3(i) of the Act.

■ It is undisputed that neither the PBPA nor the PWE has been certified with the Board as the exclusive representative of the respective units. However, section 9 of the Act allows for labor organiza-

tions that have been historically recognized to be protected by the Act. To this point, Chillicothe argues that in order for historical recognition to have occurred, the collective bargaining between the labor organization and the public employer must be in accord with section 3(b) and section 7 of the Act. Section 3(b) defines collective bargaining as "bargaining over terms and conditions of employment, including hours, wages and other conditions of employment, as detailed in Section 7." (Ill. Rev. Stat. 1985, ch. 48, par. 1603(b).) Section 7 then recites numerous requirements regarding "the duty to bargain collectively." (Ill. Rev. Stat. 1985, ch. 48, par. 1607.) We disagree with Chillicothe and adhere to the Board's determination, supported by *Village of Worth*, that historical representation and recognition are controlled by section 9 of the Act.

Section 9(c) of the Act states:

> "(c) Nothing in this Act shall interfere with or negate the current representation rights or patterns and practices of labor organizations which have historically represented public employees for the purpose of collective bargaining, including but not limited to the negotiations of wages, hours and working conditions, discussions of employees' grievances, resolution of jurisdictional disputes, or the establishment and maintenance of prevailing wage rates, unless a majority of employees so represented express a contrary desire pursuant to the procedures set forth in this Act." (Ill. Rev. Stat. 1985, ch. 48, par. 1609(c).)

Section 9(c) describes those types of negotiations which must have taken place in order to find historical representation and "(n)othing in this Act," including section 7 requirements, shall interfere with those "rights or patterns and practices." (Ill. Rev. Stat. 1985, ch. 48, par. 1609(c).) Section 9(b) of the Act pertains to historical recognition and states as follows:

> "in cases involving an historical pattern of recognition, and in cases where the employer has recognized the union as the sole and exclusive bargaining agent for a specified existing unit, the Board shall find the employees in the unit then represented by the union pursuant to the recognition to be the appropriate unit." Ill. Rev. Stat. 1985, ch. 48, par. 1609(b).

In *Village of Worth*, 2 Pub. Employee Rep. (Ill.) par. 2045, case No. S—RC—259 (Illinois State Labor Relations Board, September 24, 1986), the Board found that section 9(b) of the Act prescribes two ways of showing historical recognition. First, an employer can formally recognize a labor organization as the exclusive representative of a specified unit. Second, an employer can impliedly recognize a la-

bor organization as the exclusive representative of a specified unit. (*Village of Worth*, 2 Pub. Employee Rep. (Ill.) par. 2045, at VIII—310.) Further, that in cases of implied historical recognition, section 9(c) lists factors to be used in determining whether the public employer has manifested an intent to recognize a labor organization through historical representation. *Village of Worth*, 2 Pub. Employee Rep. (Ill.) par. 2045, at VIII—310.

■ We believe the facts of this case warrant the Board's finding that there has been historical recognition by Chillicothe of both the PBPA and PWE through a pattern of historical representation for the purposes of collective bargaining. From 1977 to the date of the petitions, Chillicothe and representatives from both the PBPA and PWE sat down and discussed employee wage concerns, albeit informally. We believe the hearing officer's findings of fact that the quality and results of these meetings were in compliance with sections 9(b) and (c) of the Act are not against the manifest weight of the evidence. *Murdy v. Edgar* (1984), 103 Ill. 2d 384, 469 N.E.2d 1085.

■ We next focus on whether the PBPA and PWE were representing appropriate units and whether those units were in existence on the effective dates of this Act. The evidence is clear that throughout the years the PBPA represented Chillicothe police officers and the PWE represented Chillicothe employees of the water and sewer department and road and bridge department. Section 3(s)(1) of the Act defines "unit" as "a class of jobs or positions which are held by employees whose collective interests may suitably be represented by a labor organization for collective bargaining." (Ill. Rev. Stat. 1985, ch. 48, par. 1603(s)(1).) However, section 9(b) of the Act states that where there has been historical recognition, "the Board shall find the employees in the unit then represented by the union pursuant to the recognition to be the appropriate unit." (Ill. Rev. Stat. 1985, ch. 48, par. 1609(b).) Thus, we need not decide whether the units are within the statutory definition of this Act since they are considered to be the appropriate unit under section 9(b). We further believe that since the Board found that there has been a historical pattern of recognition of both the PBPA and the PWE and that there has been a pattern of historical representation by those organizations of their respective units for purposes of collective bargaining, those bargaining units were "in existence on the effective date of this Act" as required by section 20(b) (Ill. Rev. Stat. 1985, ch. 48, par. 1620(b)).

■ The primary issue in this case is whether Chillicothe violated section 10(a)(4) of the Act by refusing to bargain with the PBPA and PWE. Section 10(a)(4) makes it an unfair labor practice for an em-

ployer to refuse to bargain in good faith with a labor organization which is the exclusive representative of its employees in an appropriate unit. (Ill. Rev. Stat. 1985, ch. 48, par. 1610(a)(4).) We have already determined that both the PBPA and PWE are labor organizations which exclusively represented appropriate bargaining units. Moreover, we agree with the Board's determination that Chillicothe refused to bargain based upon the letters sent by Chillicothe's attorney to the PBPA and PWE informing them of Chillicothe's refusal to negotiate an agreement over hours, wages and other terms and conditions of employment. We therefore affirm the Board's decision that Chillicothe committed an unfair labor practice in violation of section 10(a)(4) and derivatively in violation of section 10(a)(1) of the Act. Ill. Rev. Stat. 1985, ch. 48, pars. 1610(a)(1), (a)(4).

Chillicothe further asserts that the hearing officer committed prejudicial error when he allowed the admission of a certain video tape into evidence when the accuracy of the tape was not verified by a witness with personal knowledge as to the correct representation regarding the facts surrounding its creation. Chillicothe fails to state, however, any specific prejudice, nor does there appear to be reliance on the tape by the hearing officer in reaching his decision. Therefore, we find that no prejudicial error was committed.

Finally, Chillicothe asserts that the hearing officer incorrectly considered evidence involving the PWE after the effective date of the Act (July 1, 1984). (Ill. Rev. Stat. 1985, ch. 48, par. 1603(f).) We believe that there is ample evidence of historical representation by the PWE prior to July 1, 1984, to support the hearing officer's decision. We note, however, that evidence after July 1, 1984, does show a pattern of historical recognition of the PWE by Chillicothe and disagree with Chillicothe that it is clearly irrelevant.

Accordingly, for all of the above reasons, the decision of the Illinois State Labor Relations Board is affirmed.

Affirmed.

BARRY, P.J., and WOMBACHER, J., concur.