THE VILLAGE OF OAK PARK, Petitioner-Appellant, v. THE ILLINOIS STATE LABOR RELATIONS BOARD *et al.*, Respondents-Appellees.

First District (2nd Division) No. 87—2449

Opinion filed March 8, 1988.

Donald W. Anderson and Richard B. Lapp, both of Seyfarth, Shaw, Fairweather & Geraldson, of Chicago, for petitioner.

Neil F. Hartigan, Attorney General, of Springfield (Shawn W. Denney, Solicitor General, and Imelda R. Terrazino, Assistant Attorney General, of Chicago, of counsel), for respondent Illinois State Labor Relations Board.

Joel A. D'Alba, of Chicago (Asher, Pavalon, Gittler & Greenfield, Ltd., of counsel), for respondent Oak Park Lieutenants and Sergeants Association.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

We are asked to decide, on direct administrative review (Ill. Rev. Stat. 1985, ch. 48, par. 1611(e)), whether the refusal of the Village of Oak Park (Village) to recognize or bargain with respondent Oak Park Lieutenants and Sergeants Association (Association), as affiliated with the Illinois Fraternal Order of Police, Labor Council (Council), constitutes an unfair labor practice under the Illinois Public Labor Relations Act (Act) (Ill. Rev. Stat. 1985, ch. 48, par. 1601 *et seq.*), as found by the Illinois State Labor Relations Board (Board).

The issues presented in this appeal include whether the Board erred in finding that: (1) the Village "historically recognized" the Association as the bargaining representative for the lieutenants and sergeants of the Oak Park police department (Department); (2) the Association did not waive bargaining agent status; (3) the Association is a "labor organization" within the meaning of the Act; (4) the Association's affiliation with the Council does not present a conflict of interest; and (5) petitioner's refusal to bargain with the Association is an unfair labor practice.

Because *de facto* historic recognition of a bargaining representative is at issue here, we are required to examine and relate that history in considerable detail, revealing the statements and conduct of the parties with respect to wages, hours, working conditions and benefits.

The Village operates under a council-manager form of government. A board of trustees acts as its legislative policy-making body. The village manager assumes administrative responsibility of personnel matters and exercises on behalf of the municipality statutory powers regarding terms of employment, subject to the policy-making authority of the trustees. Ill. Rev. Stat. 1985, ch. 24, par. 10—4—1.

The Association was incorporated under the General Not for Profit Corporation Act (Ill. Rev. Stat. 1985, ch. 32, par. 163a *et seq.*) on June 2, 1982, in response to a policy instituted by then village manager Ralph De Santis to reduce wage differentials between Department patrol officers and their supervisory officers from 20% to 15%. The Association's articles of incorporation asserted as its primary purpose securing the best possible conditions of employment for the lieutenants and sergeants of the Department. The articles also stated that the organization would not act as, or perform any of the functions of, a labor organization. Membership in the Association is limited to Department lieutenants and sergeants, of whom all but one joined the organization.

Prior to 1982, wages, benefits and working conditions for the Department lieutenants and sergeants were negotiated between the Village and Lodge 8 of the Illinois Fraternal Order of Police (Lodge 8), which represents Department patrol officers. In 1981, however, Department lieutenants and sergeants embarked upon their own efforts to increase their wages in exchanging with De Santis salary surveys of other departments in the area.

On February 7, 1983, the Association initiated a meeting with De Santis, to "communicate a basic philosophical difference in the application of wages and benefits for Oak Park Police Officers which discriminates against" lieutenants and sergeants, and submitted a memo which included 11 "requests" for 1983, namely: (1) recognition of the Association; (2) deduction of the Association's monthly dues by the Village from lieutenants' and sergeants' pay; (3) collective bargaining with the Village; (4) a pay raise of 6.2%; (5) a health insurance plan for post-retirement; (6) a "Bill of Rights"; (7) compensation for lieutenants for overtime and the elimination of the "five hour rule," which limited overtime compensation for sergeants to any overtime worked in excess of five hours per month; (8) an increase in life insurance coverage; (9) longevity pay; (10) education incentive pay; and (11) an expanded policy for death or serious illness in the family. After De Santis met with a representative Association committee, on March 1, 1983, he denied all the Association's demands. As to "recognition," De Santis held that supervisory ranking officers

were not entitled to union status.

The Association responded with a letter to the public safety committee of the Oak Park board of trustees on March 15, 1983, in which the Association complained of De Santis' "unconcerned, indifferent attitude," and requested a meeting with the committee "to discuss our concerns and discrimination tactics against the ranking officers of your police department." Representatives of the Association appeared before the Public Safety Committee, and before the personnel subcommittee on October 25, 1983.

De Santis thereafter met with Association representatives at least three more times: on November 9, 1983, January 10, 1984, and January 30, 1984. The 11 points raised in the memorandum of February 7, 1983, were again discussed. De Santis finally acceded to Association "requests" for a higher salary and for eliminating a five-hour overtime rule, substituting a different overtime pay formula. These concessions were memorialized in a written agreement, dated February 8, 1984. That agreement also stated that: the Village reserved the right to reinstate the five-hour rule under specified conditions; lieutenants would be entitled to additional compensation for staff meetings, court time and "call backs"; and the memorandum "[represented] the complete modifications to the sergeants' and lieutenants' compensation that was unanimously agreed upon." No further discussions on these issues occurred between De Santis and the Association. None of the other Association's "requests" were met by the Village.

De Santis thereafter was replaced by John Hedges, who assumed the position of acting village manager from July 1985 until February 28, 1986.

The Association petitioned Hedges on September 30, 1985, for recognition by the Village "on all matters relating to wages, hours and conditions of employment," and enclosed signatures of 21 members of the Association to prove that more than 51% of the membership participated in this request. Hedges responded on October 14, 1985, stating that, "in keeping with our past practice," the Village would meet with Association representatives for the purpose of entering into a "letter of agreement" covering wages, hours and conditions of employment, and welcomed any proposals or suggestions by the Association, but stressed that the Village would not recognize the Association as a union.

The Association, on November 11, 1985, requested that Hedges schedule a meeting so that the Village and Association could negotiate wages, hours and working conditions, "pursuant to our past practice," and sought an expanded letter of agreement containing a larger

number of detailed provisions than was included in the February 8, 1984, document signed by De Santis.

During the week of November 18, 1985, Hedges sent a memorandum to the Association reiterating the Village's position that it would not recognize the Association as a bargaining unit or bargain with it within the meaning of the Act, nor could the Act be applied to the anticipated "meet and confer" sessions between the parties. This offer to "meet and confer" was conditioned on the signature of Richard Kus, president of the Association, to an "Acknowledgment" containing these stipulations.

Negotiations between representatives of the Association and the Village commenced on December 3, 1985, without the Association having signed the "Acknowledgment." The Association presented its proposed terms of agreement to the Village on December 6, 1985, and the Village submitted its own proposal on December 10, 1985, when the parties next met. Contained in the Village's proposal was a "Management Preamble," which asserted that the Village considered police sergeants and lieutenants to be managerial or supervisory employees of the Village, specifically accountable to their superiors for the performance of their subordinates. The Association opposed the preamble, but the Village insisted upon it. Without agreement on the preamble, the parties discussed the Village's proposals and came to an immediate agreement on a grievance procedure; a bill of rights for Association members; rules for sick leave, funeral leave and vacations; uniform allowances for lieutenants and sergeants; and a savings clause.

At the next meeting, December 17, 1985, Hedges demanded that the "Acknowledgment" be signed before further discussions ensued. Kus refused to sign it unless two additional sentences were added, namely, that: the "Acknowledgment" would be in effect only for the same period as the letter of agreement; and the signing of the "Acknowledgment" waived rights the Association "may have" under section 3(s)(2) of the Act only for the term of the agreement. (Ill. Rev. Stat. 1985, ch. 48, par. 1603(s)(2).) Kus signed the document as thus amended by the Village several hours after the meeting adjourned.

When the parties again met on December 18, 1985, the Association offered a package proposal to the Village: if the Village accepted Association terms on certain items, including life insurance, overtime compensation for lieutenants and hospitalization insurance, the Association would drop its demands concerning holidays, leave for illness in the family and overtime compensation for sergeants. Chief of Police Bergstrom and Hedges found only one of the terms acceptable

and the Association rescinded the package offer. The parties similarly failed to agree as to whether the management preamble should be placed in the final letter of agreement.

Kus complained by letter to Hedges on December 19, 1985, that the Village's most recent offer was unacceptable and that the "take it or leave it" attitude adopted by the Village demonstrated "bad faith tactics." Kus offered, nonetheless, to continue negotiations, and the parties met again on December 23, 1985. The Association submitted a graph depicting pay differentials between patrolmen, sergeants and lieutenants in the department. The Village declined to alter its wage-increase position. The parties discussed low productivity and poor morale in the department, which the Association agreed to seek to ameliorate during the first quarter of 1986, after which time the parties concurred that they would meet and negotiate another agreement.

On December 28, the Association and Village agreed to limit the duration of the letter of agreement to 1985 and repeated their mutual commitment to confer further in 1986. Hedges insisted that the management preamble appear in the letter of agreement, but agreed to remove certain phrases and the statement that the lieutenants and sergeants were agents of management. Hedges further stated that the letter of agreement would be "enforceable in a court of law" and that he would seek the approval of the board of trustees to increase the amount of life insurance for lieutenants and sergeants.

At the final meeting conducted December 30 or 31, 1985, the Village announced it would: grant the requested life insurance increase from $5,000 to $10,000; accept the suggested changes in shift and vacation policies; and place the management preamble above the caption "Letter of Agreement." The document was then signed by both parties.

When the Village and the Association conferred a last time on February 7, 1986, the Association offered to drop its demand for recognition as a union and for collective bargaining if the Village would accept binding grievance arbitration and interest impasse resolution, which Hedges refused.

Also in early 1986, the Association entered into an affiliation with the Council; the Council would conduct collective-bargaining negotiations with the Village on the Association's behalf and administer the resulting collective-bargaining agreement. The Council maintains a similar affiliation with the patrol officers' union, Lodge 8, but collective-bargaining negotiations are conducted separately for each bargaining unit.

Pursuant to section 9 of the Act (Ill. Rev. Stat. 1985, ch. 48, par.

1609), the Association, as affiliated with the Council, filed a petition with the State Labor Relations Board on February 21, 1986, and an amended petition on April 30, 1986, seeking certification as the exclusive collective-bargaining agent of all Department lieutenants and sergeants. The Association's application followed an amendment to the Act, effective January 1, 1986, which recognized supervisory employees as a possible bargaining unit. (Ill. Rev. Stat. 1985, ch. 48, par. 1603(s).) The Association sought certification as the representative of a "historic bargaining unit," a well-defined group of employees with whom their employer has engaged in a "historical pattern of recognition," thereby entitling the employee bargaining agent to union status. Ill. Rev. Stat. 1985, ch. 48, par. 1609(b).

The Village opposed the petition by letter dated March 18, 1986, asserting: (1) lieutenants and sergeants are "supervisors" within the meaning of the Act and are therefore excluded from recognition as a bargaining unit (Ill. Rev. Stat. 1985, ch. 48, pars. 1603(n), (r)); (2) there was no "historical pattern of recognition" of the Association by the Village or "bargaining" with the Association as required by the Act (Ill. Rev. Stat. 1985, ch. 48, par. 1609(b)); and (3) the Council acted as bargaining agent for both supervisory officers and police officers, thus raising a conflict of interest.

Hearings conducted by a Board hearing officer between June 23, 1986, and July 25, 1986, resulted in a recommendation on November 24, 1986, stating: (1) a historical bargaining unit existed on the effective date of the amended Act; (2) the "Acknowledgement" signed by Kus in December 1985 neither waived the Association's right to historical recognition nor estopped the Association from claiming the benefit of that status; and (3) the Association is a "labor organization" within the meaning of the Act.

The Board issued an opinion on February 27, 1987, which adopted the hearing officer's order and additionally found that the mutual affiliation of the Association and Lodge 8 with the Council created no conflict of interest. (See *Village of Oak Park*, 3 Pub. Employee Rep. (Ill.) par. 2023, case No. S—RC—265 (Illinois State Labor Relations Board Feb. 27, 1987).) The Board then ordered a secret ballot election to be conducted among employees in the bargaining unit to determine whether the Association would act as their exclusive bargaining agent (Ill. Rev. Stat. 1985, ch. 48, par. 1609(d)), and on March 20, 1987, a majority of those employees elected the Association as their exclusive collective-bargaining representative. A certification of representation was issued by the Board on March 31, 1987.

On April 21, 1987, the Association's request for a meeting with

Village representatives for the purpose of negotiating an agreement concerning wages, hours and other terms and conditions for the employees in the bargaining unit was declined, the Village intending to provoke the Board into issuing an unfair labor practice order, in order to achieve a posture of finality and appealability in this court. *Cf. Laborer's International Union of North America, Local 1280 v. Illinois State Labor Relations Board* (1987), 154 Ill. App. 3d 1045, 1053, 507 N.E.2d 1200.

A "Charge Against Employer" filed with the Board resulted in the Board issuing a complaint alleging that the Village committed an unfair labor practice in violation of sections 10(a)(1) and 10(a)(4) of the Act and ordering the Village to appear before the Board to answer this charge. (Ill. Rev. Stat. 1985, ch. 48, pars. 1605(f), 1610(a)(1), (a)(4), 1611.) In its answer filed June 11, 1987, the Village admitted refusing to bargain with the Association "in order to obtain court review of the appropriate bargaining unit."

By agreement, the case was referred directly to the Board without a preliminary hearing. The Board issued its decision on July 23, 1987, ruling as first above described. This appeal followed.

I

The Village initially contends that the Board erred in finding that it "historically recognized" the Association as the representative of a bargaining unit. Ill. Rev. Stat. 1985, ch. 48, par. 1609(b).

■ ■ Historical recognition may be either formal or *de facto*. (*Village of Worth*, 2 Pub. Employee Rep. (Ill.) par. 2045, case No. S—RC—259, at VIII—310 (Illinois State Labor Relations Board Sept. 24, 1986).) Formal recognition is absent in this case. *De facto* recognition occurs when an employer, by its conduct, implicitly recognizes the labor organization as an exclusive representative of the employees in a specified unit as of the effective date of the Act or the amended Act. (*Village of Worth*, 2 Pub. Employee Rep. (Ill.) par. 2045, at VIII—310; see also *City of Chillicothe v. Illinois State Labor Relations Board* (1988), 165 Ill. App. 3d 217, 226-27; *City of Calumet City*, 2 Pub. Employee Rep. (Ill.) par. 2047, case No. S—RC—143, at VIII—330 (Illinois State Labor Relations Board Sept. 24, 1986).) Certain section 9(c) factors of the Act have been particularly indicative of whether the employer has granted an organization *de facto* recognition; when the employer has historically dealt with a labor organization over wages, hours and working conditions, grievances, jurisdictional disputes or the establishment and maintenance of prevailing wage rates, the employer has manifested an intent to recognize and deal with the repre-

sentative of its employees, albeit informally, and will be deemed to have granted it *de facto* recognition. *City of Chillicothe v. Illinois State Labor Relations Board* (1988), 165 Ill. App. 3d 217, 226-27; *Village of Worth*, 2 Pub. Employee Rep. (Ill.) par. 2045, at VIII—310; *City of Calumet City*, 2 Pub. Employee Rep. (Ill.) par. 2047, at VIII—330; Ill. Rev. Stat. 1985, ch. 48, par. 1609(c).

Here De Santis and Hedges both testified that they consistently refused to "recognize" the Association in any representative or union-type capacity. John Philbin, a Village trustee, and Clifford Osborn, Village president, also averred that the Village maintained a "no recognition policy" between 1983 and 1985, and communicated this policy to the Village managers. The record reveals, however, that by its conduct the Village, through its governmental representatives, did so recognize the Association, as found by the Board.

Members of the Association, as well as De Santis, agreed that prior to the Association's formation, no organization or individual negotiated wages, hours or working conditions exclusively on the ranking officers' behalf; any benefits achieved were the by-product of negotiations by Lodge 8 for the Village patrolmen; however, following the organization of the Association, discussions in 1983 and 1984 concerning employment terms for lieutenants and sergeants were initiated by Association letters to the Village and were conducted solely between Association and Village representatives. Both parties, moreover, agreed in late 1985 to continue the bargaining relationship into 1986 and did, in fact, meet in February 1986 for those purposes.

Association members were clearly identified as a bargaining unit. The organization's articles of incorporation set forth as its primary purpose to secure the best possible conditions of employment for the Department lieutenants and sergeants. De Santis was aware of this statement and was aware that the Association intended to act as a union. Correspondence between the Village and the Association, as well as the 1984 and 1985 agreements, specifically stated that the benefits sought and ultimately rewarded were intended for sergeants and lieutenants. Moreover, Art Stone (Stone), director of the Council, and David Wickster (Wickster), president of Lodge 8, both agreed that collective-bargaining negotiations on behalf of the patrolmen were conducted entirely separate from the Association's negotiations.

■ The record evidence showed that the parties met at least four times in 1983 and 1984, six times in 1985, and once in 1986, prior to the Association's petition for certification. Each meeting was prompted by an Association letter to the Village, requesting discussions of wages, hours and working conditions. Correspondence be-

tween the parties in November 1985 explicitly stated a desire to discuss these items in accordance with "past practice." The 1983 through 1985 discussions, and the written agreements finalized as a result of these meetings, covered employment-related topics, including: wages, overtime compensation, insurance, uniform and vacation policies and grievance procedures.

■ From the foregoing, the Board's determination that the Village historically recognized the Association as a *de facto* representative and bargaining agent therefore clearly rested upon an evidentiary foundation. On appeal from an administrative agency decision, a reviewing court may not reweigh evidence or make independent determinations of fact; the findings and conclusions of the agency on fact questions are deemed *prima facie* true and correct. (*Board of Education v. Illinois Educational Labor Relations Board* (1986), 143 Ill. App. 3d 898, 906, 493 N.E.2d 1130.) The agency's decision must be confirmed unless against the manifest weight of the evidence (*Rockford Township Highway Dept. v. Illinois State Labor Relations Board* (1987), 153 Ill. App. 3d 863, 872, 506 N.E.2d 390; *Board of Education v. Illinois Educational Labor Relations Board,* 143 Ill. App. 3d at 906); in other words, whether an opposite conclusion is clearly evident (*City of Wood Dale v. Illinois State Labor Relations Board* (1988), 165 Ill. App. 3d 640, 643). We cannot say here that the Board's decision was against the manifest weight of the evidence or that an opposite conclusion is clearly evident.

The Village characterizes the Village-Association encounters as "meet and confer" sessions, with no real "give and take" between the participants, and distinguishable from formal collective bargaining with recognized unions, such as Lodge 8. As an example, the Village notes that nearly all the terms of the 1985 letter of agreement were derived from existing sources, such as the 1985 collective-bargaining contract between the Village and Lodge 8, the Village personnel manual, and existing police department practices, and were merely "codified" in the letter of agreement. The Village further asserts that of the terms ultimately agreed upon, few were actually the result of a genuine compromise, and most were virtually the same as the Village's original position at the start of negotiations. The Village admits, however, that it altered its initial stance as to the five-hour rule for sergeants and overtime compensation for lieutenants in the 1983 negotiations, and its position on the issues of life insurance and vacation policy in the 1985 meetings. Furthermore, the Association won · concessions sought on the phrasing of the management preamble and the "Acknowledgment" before the agreement was executed. In any

event, it is the *conduct* of the parties which is the essence of *de facto* recognition; the parties' conduct here demonstrates a pattern of dealing with each other on key employment-related issues.

■ The Village nevertheless insists that the Board's construction of the term "recognition" is too "relaxed," violating the "plain meaning," "strict construction" and "prospective operation" rules of statutory interpretation. The expertise and experience of administrative agencies, while not binding on the courts, entitle their interpretation of legislative intent to great weight and deference (*Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n* (1983), 95 Ill. 2d 142, 152-53, 447 N.E.2d 295), particularly where, as here, the statute is construed by an agency charged with its enforcement and administration. (*Airey v. Department of Revenue* (1987), 116 Ill. 2d 528, 536, 508 N.E.2d 1058.) Section 5(a) of the Act entrusts the Board with the Act's administration, confers upon it the jurisdiction to hear and render decisions on disputes arising under the Act, and mandates that all Board members have at least five years' experience in the labor relations field, demonstrating the knowledge and expertise which the Board brings to its determination. Ill. Rev. Stat. 1985, ch. 48, par. 1605(a).

■ The language of the Act, moreover, favors historical recognition (see Ill. Rev. Stat. 1985, ch. 48, pars. 1603(s)(1), 1604, 1620(b)); and the legislation must be construed liberally to effectuate its purpose (see *Board of Education v. Illinois Educational Labor Relations Board*, 143 Ill. App. 3d at 907; see also *Village of Worth*, 2 Pub. Employee Rep. (Ill.) par. 2045, at VIII—311). A reading of the Act which grants the Village benefits of *de facto* collective bargaining on one hand, yet permits it to disavow the obligations of the bargaining process on the other, does violence to the legislative intent underpinning the Act.

■ The Village also urges that, because the Board is a "new" agency, its reading of the Act is entitled to less consideration than opinions issued by more established administrative bodies. *City of Decatur v. Illinois State Labor Relations Board* (1986), 149 Ill. App. 3d 319, 325, 500 N.E.2d 573, *appeal denied* (1987), 113 Ill. 2d 572, 505 N.E.2d 351, on which the Village relies to support this proposition, does not persuade. *City of Decatur* cites no authority for this conclusion, nor does it suggest a date at which time the Board will have sufficiently matured to give its decisions adequate stature. The legislature itself has expressed its confidence in the Board's ability to administer the statute through the broad grant of administrative power enunciated in the Act. The Village raises no viable argument as

to why the courts should not share that confidence.

Accordingly, we hold that the Board did not err in finding the Association membership to be an historically recognized bargaining unit and exclusive representative of the Department's sergeants and lieutenants.

## II

The Village maintains that the "Acknowledgment" signed by Kus waived the Association's right to rely on the 1985 discussions to support its claim of historical recognition.

Although the three paragraphs of the "Acknowledgment" claimed to be operative stated that the lieutenants and sergeants do not constitute a "bargaining unit" within the meaning of the Act, the "meet and confer" discussions referred to in the memorandum are not intended to constitute "bargaining" within the meaning of the Act nor are they to be construed as evidencing or constituting a choice on the part of the Village to bargain in accordance with the Act, and that the Act would not apply to meet and confer discussions described herein or to the resulting letter of agreement, two qualifying sentences were added to the document before Kus signed it on December 17, 1985, namely, that the letter would be in effect only for the same time period as the letter of agreement and the signing of the "Acknowledgment" waived rights only for the term of the agreement.

■ A valid waiver requires the intentional relinquishment of a known right. (*Western Casualty & Surety Co. v. Brochu* (1985), 105 Ill. 2d 486, 499, 475 N.E.2d 872.) Evidence that a party to a labor agreement intended to waive a statutory right must be clear and unmistakable. *International Union, United Automobile, Aerospace, & Agricultural Implement Workers v. NLRB* (7th Cir. 1986), 802 F.2d 969, 973.

■ The evidence in support of the waiver argument is far from clear and unmistakable. For example, the Association refused to accept the waiver as initially drafted and strictly limited its duration. Next, Kus testified he reluctantly signed the document because he believed it was the only way the Association and the Village could finalize an agreement. Finally, the parties agreed to continue negotiations in 1986; the Association reasonably could have believed the waiver would not prevent a finding of "historical recognition" as of the date the amended Act became effective.

Even assuming a valid waiver, the Board still had the right to find historical recognition under the test established in *Village of Worth*: the 1983-84 negotiations plus the discussion of February 1986 are suf-

ficient to demonstrate a Village pattern of dealing with the Association, in effect when the amended Act became law. *Village of Worth*, 2 Pub. Employee Rep. (Ill.) par. 2045, case No. S—RC—259 (Illinois State Labor Relations Board Sept. 24, 1986).

The Village also urges that, if the waiver is ruled ineffective, the Association should be estopped from relying on the 1985 discussions as evidence of historical recognition, because the Village's willingness to engage in those negotiations was conditioned upon execution of the "Acknowledgment."

■■ ■ A party asserting the estoppel doctrine must show that: (1) it relied on an unambiguous promise; (2) reasonably intended to induce the relying party to change its position; and (3) the relying party actually changed its position. (See *Lawrence v. Board of Education* (1987), 152 Ill. App. 3d 187, 201, 503 N.E.2d 1201; *Gerson Electric Construction Co. v. Honeywell, Inc.* (1983), 117 Ill. App. 3d 309, 312, 453 N.E.2d 726.) The Village demonstrated reliance on the Association's promise by refusing to continue the negotiations unless the waiver was signed; however, it did not alter its position in reliance on the executed "acknowledgment" since it agreed to limit the waiver of the Association's statutory rights to 1985 only. If the Village intended to bar historical recognition of the Association as a bargaining agent, it is inconsistent with that intent not to have included the 1983-84 and 1986 bargaining in the "Acknowledgment." These activities preceding and following the 1985 negotiations are sufficient in and of themselves to support the Board's finding of a historical pattern of recognition.

From the foregoing, we cannot find that the Board erred in refusing to identify a valid waiver of the Association's rights.

### III

The Village next asserts error in the Board's finding that the Association is a "labor organization" within the meaning of the Act (Ill. Rev. Stat. 1985, ch. 48, par. 1603(i)) since, prior to the 1986 amendment to the Act, the Association's status would have had to be determined with reference to the General Not for Profit Corporation Act (Ill. Rev. Stat. 1985, ch. 32, par. 163a *et seq.*), pursuant to which the Association was incorporated in 1982. Under those statutory terms, a non-profit corporation may not also function as a labor organization. (See Ill. Rev. Stat. 1985, ch. 32, par. 163a3.) Moreover, the Association's articles of incorporation expressly provide that it will not "act as or perform any of the functions of a labor union."

■■ Statutory terms where defined must be construed according

to the definitions contained in the statute. (*Krebs v. Thompson* (1944), 387 Ill. 471, 478, 56 N.E.2d 761; *Heritage Bank & Trust Co. v. Harris* (1985), 132 Ill. App. 3d 969, 973, 478 N.E.2d 526.) Section 3(i) of the Act defines a "labor organization" as "any organization in which public employees participate and which exists for the purpose, in whole or in part, of dealing with a public employer concerning wages, hours and other terms and conditions of employment, including the settlement of grievances." Ill. Rev. Stat. 1985, ch. 48, par. 1603(i); *City of Chillicothe v. Illinois State Labor Relations Board* (1988), 165 Ill. App. 3d 217, 224-25; *Sangamon County Highway Department*, 1 Pub. Employee Rep. (Ill.) par. 2006, case No. S—RC—12, at VIII—25, VIII—26 (Illinois State Labor Relations Board June 6, 1985).

 In the case *sub judice*, lieutenants and sergeants of the Department obviously qualify as "public employees" under the Act. (See Ill. Rev. Stat. 1985, ch. 48, pars. 1603(n), (s).) Although the Association's articles of incorporation state that it will not act as or perform the functions of a labor union, there was evidence that this sentence was included only to comply with the corporation statute, and did not represent the organization's intent. Indeed, another provision of the corporate charter portrays the Association's "primary purpose" as "securing the best possible conditions of employment for its members." De Santis and other Village officials were aware of the Association's intent to act as a union and gain employment-related benefits for the Department's lieutenants and sergeants.

The participation of the bargaining unit is indicated in that all but one of the 22 ranking officers in the Department joined the Association and shared in electing officers, paying dues, voting on proposals, and conducting meetings on a regular basis. The 11-point memorandum of 1983, addressed to De Santis, and the September 1985 memorandum sent to Hedges expressed the Association's desire to negotiate wages, hours, working conditions and benefits with the Village. These issues were also the subject of numerous meetings between the parties from 1983 through 1986.

Finally, section 15(a) directs that the Act controls when any of its provisions conflict with another law (Ill. Rev. Stat. 1985, ch. 48, par. 1615(a)). Therefore, whether a labor organization properly may incorporate under the not for profit corporation statute is irrelevant to whether it qualifies as a "labor organization" under the Act.

The Board did not err in finding the Association to be a labor organization within the meaning of the Act.

## IV

The Village further argues that the dual affiliation of Lodge 8 and the Association with the Council raises a conflict of interest which should bar the Association's certification as a bargaining representative.

■ Supervisory employees and the rank and file are prohibited from engaging in collective bargaining through a common union because an inherent conflict of interest arises when those invested with the duty to hire, fire, and administer discipline are subject to control by the same union representing their subordinates. (*NLRB v. Res-Care, Inc.* (7th Cir. 1983), 705 F.2d 1461, 1465-66.) Where, however, the connection between management and their inferiors is limited to a corresponding affiliation with a third organization, as in this case, the perceived conflict of interest does not arise. See *Hudson County,* 10 PER (NJ) par. 15153 (N.J. PERC 1984).

■ Stone averred that council negotiations for Lodge 8 and the Association are conducted separately and that patrolmen play no role in the bargaining of labor agreements for their superior officers. Wickster stated that all members of the Department, including ranking officers, may join Lodge 8, but stressed that only patrolmen negotiate their collective-bargaining contracts with the Village; lieutenants and sergeants have no influence on the ratification of bargaining agreements by the rank and file. The Association elects its own officers, solicits dues from its members only, and ratifies its own agreements. Although Lodge 8 and the Association, as Council affiliates, pay additional dues to the Council and grant the Council the right to review bargaining agreements negotiated by the unions, such restrictions on their autonomy do not demonstrate that either union participates directly or indirectly in the other's affairs.

Reliance on *Elk Grove Firefighters Local No. 2340 v. Willis* (N.D. Ill. 1975), 400 F. Supp. 1097, is misplaced by the Village. There, the court upheld the municipality's prohibition against fire department captains and lieutenants belonging to "any union which also has as members rank and file firefighters." (*Elk Grove Firefighters,* 400 F. Supp. at 1099.) In the present case, there are sound structural safeguards separating the negotiating activities of the Association and Lodge 8; unlike the labor organization in *Elk Grove Firefighters,* they operate as distinct unions.

The Board therefore correctly ruled that affiliation with the Council by Lodge 8 and the Association presents no conflict of interest.

## V

Although the parties do not argue this issue in their briefs, for completeness we elect to consider whether the Village violated section 10(a)(4) of the Act by refusing to bargain with the Association, as held by the Board.

It is an unfair labor practice to decline to bargain in good faith with a labor organization which is the exclusive representative of its employees in an appropriate bargaining unit. (Ill. Rev. Stat. 1985, ch. 48, par. 1610(a)(4).) We have affirmed the Board's finding that the Association is a labor organization. The Village has admitted that it refused to bargain with the Association as the exclusive representative of the lieutenants and sergeants of the Department. The Board thereby correctly found the Village guilty of an unfair labor practice in violation of the Act. See *City of Chillicothe v. Illinois State Labor Relations Board* (1988), 165 Ill. App. 3d 217, 227-28; Ill. Rev. Stat. 1985, ch. 48, pars. 1610(a)(1), (a)(4).

For the reasons set forth above, the decision of the Board must be affirmed.

Affirmed.

STAMOS and BILANDIC, JJ., concur.