AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, Petitioner-Appellant, v. THE ILLINOIS STATE LABOR RELATIONS BOARD *et al.*, Respondents-Appellees.

First District (6th Division)   No. 1—88—3091

Opinion filed October 27, 1989.

Cornfield & Feldman, of Chicago (Stephen A. Yokich, of counsel), for petitioner.

Neil F. Hartigan, *Attorney General*, of Springfield (Robert J. Ruiz, Solicitor General, and William D. Frazier, Assistant Attorney General, of Chicago, of counsel), for respondent Illinois State Labor Relations Board.

Sidley & Austin, of Chicago (John G. Levi, Pamela B. Strobel, and Neil L. Brilliant, of counsel), for respondent State of Illinois, Departments of Central Management Services and Corrections.

Winston & Strawn, of Chicago (Gregory J. Malovance and William G. Miossi, of counsel), for *amicus curiae*.

JUSTICE QUINLAN delivered the opinion of the court:

The American Federation of State, County, and Municipal Employees (AFSCME) appeals a final order of the Illinois State Labor Relations Board (ISLRB or Board). On September 29, 1988, ISLRB ruled that the Illinois Departments of Central Management Services (CMS) and Corrections (IDOC or Corrections) were compelled to bargain with AFSCME about the impact of employee discipline under the new policy for drug testing but not about the institution of drug testing itself. ISLRB allowed IDOC to institute the new policy but ordered both parties to bargain further on the subject of employee discipline. AFSCME now appeals directly to the appellate court, claiming court jurisdiction under section 11 of the Illinois Public Labor Relations Act (Ill. Rev. Stat. 1987, ch. 48, par. 1611(c)) and Supreme Court Rule 335 (107 Ill. 2d R. 335).

On this appeal AFSCME asserts:

(1) The ISLRB ruling that the IDOC policy to implement employee drug testing was a managerial right and not a mandatory subject of bargaining is unreasonable and should be reversed.

(2) The ISLRB finding that IDOC did not waive its right to institute a drug-testing program for corrections employees during the term of the current contract is not supported by substantial evidence and should be reversed.

The AFSCME dispute over drug testing began when AFSCME and CMS negotiated a contract to cover 37,000 State employees in eight bargaining units for the contract period of July 1, 1986, to June 30, 1989. AFSCME and CMS had discussed possible drug testing (blood and urine) for all State employees under AFSCME. After substantial disagreement, CMS withdrew its proposals.

As far as the record shows, the parties did not bargain over CMS's withdrawal or discuss whether CMS had waived drug testing for the duration of the contract. The parties did, however, place a waiver "zipper clause" in article XXXIV, section 4, of their master collective bargaining agreement. In this clause, the parties acknowledged their mutual "unlimited right and opportunity to make demands and proposals with respect to any subject or matter within

the area of collective bargaining \*\*\* and that the understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement."

In January 1988, a manager from CMS informed an AFSCME official that IDOC wanted to begin drug testing for the roughly 9,000 employees in the Corrections unit. AFSCME did not question the State's right to implement a drug-testing program but did want to help shape the terms. Therefore, during January and February, AFSCME met with CMS and IDOC four times to consider and negotiate many aspects of a testing policy. Parties agreed to limit testing to situations where IDOC has a "reasonable suspicion" that the employee was a user or trafficker. Parties also agreed on such items as the procedure for urine testing, the allocation of costs, and confidentiality. However, they still had not agreed on the important topic of discipline measures for employees who either refuse to take the test or who take it and test positive.

On March 1, 1988, AFSCME challenged the new policy by filing a charge with ISLRB under section 11 of the Illinois Public Labor Relations Act (Act) (Ill. Rev. Stat. 1987, ch. 48, pars. 1601 through 1627). AFSCME alleged unfair labor practices on the grounds that IDOC and CMS had not engaged in all the necessary mandatory bargaining for the new drug-testing policy.

Both the hearing officer and later the Board itself reached their decisions by reviewing the AFSCME complaint as a problem of applying two contradictory sections of the Illinois Public Labor Relations Act (Act). To resolve the problem, both tribunals balanced section 7, on the duty to bargain, with section 4, on management rights. The four relevant provisions provide:

(1) The public employer has a duty to "negotiate in good faith with respect to wages, hours, and other conditions of employment, not excluded by Section 4 of this Act \*\*\*." Ill. Rev. Stat. 1987, ch. 48, par. 1607.

(2) Employers are "not \*\*\* required to bargain over matters of inherent managerial policy" which include the "selection of new employees, examination techniques and direction of employees." Ill. Rev. Stat. 1987, ch. 48, par. 1604.

(3) Employers are required to "bargain collectively" over "policy matters directly affecting wages, hours and terms and conditions of employment as well as the impact thereon" if employee representatives request bargaining. Ill. Rev. Stat. 1987, ch. 48, par. 1604.

(4) Furthermore, refusing to bargain collectively and in good

faith constitutes an unfair labor practice. Ill. Rev. Stat. 1987, ch. 48, par. 1610.

By law, security is a concern of managerial policy for IDOC. The department must "establish rules and regulations for the protection of the person and property of employees of the Department and every committed person." (Ill. Rev. Stat. 1987, ch. 38, par. 1003—7—4.) One of the important present security concerns in State prisons involves drug traffic there. IDOC presented undisputed evidence that both visitors and employees brought drugs into the prison, that the majority of inmates were or had been drug users, and that some inmates died of overdoses while in prison.

Employee conduct is a key aspect of the security problem. At the initial hearing, the Bureau of Inspections and Audits (BIA) presented details about employee drug use and trafficking among inmates. In a voluntary survey conducted among Corrections' trainees in 1985, almost 18% admitted they were involved with illegal drugs. In the six-month period before IDOC suggested the new program, BIA documented 21 drug- or alcohol-related activities involving employees. BIA ran 19 "sting" operations between July 1986 and spring 1988 to catch employees who deliver drugs to inmates. In 18 of these operations, the employee dealers were also drug users. As of spring 1988, BIA was investigating 217 employees for possible drug dealing at Corrections facilities.

Each Corrections unit also polices employee drug trafficking among inmates. Routinely, the units conduct canine sniffs of cars in the lot and of the employees themselves. Furthermore, if investigators have "reasonable suspicions," they conduct pat-down and strip searches of employees. These measures, however, have not eliminated the drug traffic from employee to inmate in the State prisons.

On May 19, 1988, the ISLRB hearing officer issued a recommended decision and order stating that the IDOC plan to implement a drug-testing policy was an inherent managerial right, not a mandatory subject for bargaining. However, he suspended the drug testing for current employees until the parties bargained over the effects of the policy on these employees. Both parties appealed to the Board. On September 29, 1988, ISLRB issued a decision and order modifying the earlier recommendations so that IDOC could implement its policy even while it continued to bargain over the subject of discipline for employees who refuse to take the test or who take it and test drug-positive.

AFSCME's first issue on appeal is that the ISLRB made an unreasonable decision when it found that the new IDOC plan for em-

ployee drug testing is not a mandatory subject for bargaining between the employer IDOC (or CMS) and the employees under AFSCME. To reach its decision, ISLRB applied a balancing test with two statutory provisions, one on the employer's duty to bargain and the other on the employer's right to effect managerial policies unilaterally. AFSCME now challenges ISLRB's interpretation of the statute sections, its use of the balancing test, and its application of facts within that test.

■ The Supreme Court and Illinois courts grant "substantial weight and deference to an interpretation of an ambiguous statute by the agency charged with the administration and enforcement of the statute." (*Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n* (1983), 95 Ill. 2d 142, 152, 447 N.E.2d 295, 300, citing *Gladstone Realtors v. Village of Bellwood* (1979), 441 U.S. 91, 107, 60 L. Ed 2d. 66, 81, 99 S. Ct. 1601, 1612.) Furthermore, in labor cases, the rulings of the National Labor Relations Board (NLRB) and the Federal courts when these bodies construe the National Labor Relations Act are persuasive authority for similar provisions in the State Act. *East Richland Educational Association, IEA-NEA v. Illinois Educational Labor Relations Board* (1988), 173 Ill. App. 3d 878, 902, 528 N.E.2d 751, 765.

When the Supreme Court reviewed an NLRB decision about whether a particular topic was a subject for mandatory bargaining, the court used a standard of "considerable deference" for that review. (*Ford Motor Co. v. NLRB* (1979), 441 U.S. 488, 495, 60 L. Ed 2d 420, 427, 99 S. Ct 1842, 1848.) Following *Ford*, the fourth district in Illinois used "substantial" or "considerable" deference for reviewing a decision on mandatory bargaining made by the Illinois Educational Labor Relations Board (IELRB). (*Decatur Board of Education, District No. 61 v. Illinois Educational Labor Relations Board* (1989), 180 Ill. App. 3d 770, 774-75, 536 N.E.2d 743, 746.) As a rule, that court would not substitute its less informed opinion for appropriate agency expertise. (*Decatur*, 180 Ill. App. 3d at 775, 536 N.E.2d at 746.) If the ISLRB construes the statute incorrectly, however, a court must then overturn the agency's ruling which contains an erroneous interpretation of the law. *County of Menard v. Illinois State Labor Relations Board* (1988), 177 Ill. App. 3d 139, 143, 531 N.E.2d 1080, 1083.

In the case before us, the ISLRB applied the statute to very specific facts in a balance test between sections 4 on management rights and 7 on the duty to bargain. This balance depends on whether, before weighing the sections, ISLRB correctly interpreted the factual

application of each section in this case. Thus, this case presents a mixed question of fact and law in the AFSCME challenge to the ISLRB ruling.

The threshold subissue then is whether IDOC and CMS did have a duty to bargain over the decision to implement a testing program. AFSCME argues that any program as invasive and intrusive as drug testing affects employees' rights on the job, and because it affects employees' rights, it is a subject of mandatory bargaining. The State, in turn, points out that drug testing based on "reasonable suspicion" is essential, under today's circumstances, for IDOC to perform its legal functions. Therefore, drug testing is a managerial right.

■■ Section 7 of the Illinois Public Labor Relations Act imposes a duty to "bargain collectively" or "negotiate in good faith with respect to wages, hours, and other conditions of employment, not excluded by Section 4 of this Act." (Ill. Rev. Stat. 1987, ch. 48, par. 1607.) Section 4 allows employers to act unilaterally in "matters of inherent managerial policy, which shall include such areas of discretion or policy as *** the *** selection of new employees, examination techniques and direction of employees." (Ill. Rev. Stat. 1987, ch. 48, par. 1604.) Clearly, tension exists between the two provisions; any managerial policy will have some impact on conditions of employment.

The Supreme Court found the limits for managerial policy in the private sector by looking at its practical effects. Some areas of inherent management concern, the Court ruled, cannot be resolved through negotiations between sides and, therefore, are not subjects for mandatory bargaining. (*First National Maintenance Corp. v. NLRB* (1981), 452 U.S. 666, 678, 69 L. Ed. 2d 318, 330, 101 S. Ct. 2573, 2580.) The Court added: "Management must be free from the constraints of the bargaining process to the extent essential for the running of a profitable business." (*First National Maintenance*, 452 U.S. at 678, 69 L. Ed. 2d at 330, 101 S. Ct. at 2580-81.) The ISLRB has adopted the Supreme Court standard for public sector cases in Illinois. *State of Illinois, Department of Central Management Services*, 1 Pub. Employee Rep. (Ill.) par. 2016, No. S—CA—36 (ISLRB August 29, 1985).

In other States, courts have found that bargaining is not mandatory for public employers if it would impair public policy or contravene a statute. (*In re Local 195* (1982), 88 N.J. 393, 401-05, 443 A.2d 187, 190-93.) For example, a police department may impose polygraph testing to investigate criminal conduct on the force. If the functions of the department are disrupted by the criminal conduct of

employees, the employer's needs for law enforcement on the job "override the employees' interest in negotiation." *Local 364, International Brotherhood of Police Officers v. Labor Relations Comm'n* (1984), 391 Mass. 429, 440, 462 N.E.2d 96, 103.

The NLRB has considered drug testing for employees in the private sector. In one case, employees in a concrete pipe plant claimed the right to mandatory bargaining over the subject of drug testing for employees who suffer injuries on the job. NLRB found that drug testing was "germane to the working environment" but did not lie at the "core of entrepreneurial control" for plant employers. (*Johnson-Bateman Co.* (1989), 295 NLRB Dec. (CCH) No. 26, par. ____, 131 LRRM (BNA) 1393, 1396-97.) The implementation of this particular drug-testing policy, instituted only to reduce insurance rates, was a subject for mandatory bargaining. *Johnson-Bateman*, 295 NLRB Dec. (CCH) No. 26 at ____, 131 LRRM (BNA) at 1397-98.

In the case here, IDOC ties its new policy to the security needs of the prison system. Under the Unified Code of Corrections, IDOC must "establish rules and regulations for the protection of the person and property of employees of the Department and every committed person." (Ill. Rev. Stat. 1987, ch. 38, par. 1003—7—4.) In the ISLRB hearing, IDOC presented evidence about the numerous prison security problems linked to the employee drug trade. IDOC also documented employee drug use, employee drug trafficking, and a strong correlation between the two. Finally, IDOC detailed the other measures it had taken to curtail the drug trade by employees. Canine sniffs, pat-down and even strip searches of employees had not eliminated the employee drug traffic among inmates at the prison.

■ We believe the new policy is a further security measure. IDOC plans to test employees only if the State has "reasonable suspicions" of employee drug use. The point of the policy is not to affect terms of employment, but rather to curb criminal conduct which affects the job. We agree with the hearing officer's finding that the installation of a new drug-testing policy is necessary under the circumstances to perform IDOC's statutory function of securing persons and property at the prison. Therefore, we find that the decision to install this testing is not a subject for mandatory bargaining as defined in section 4.

We also believe that, even if the institution of a drug-testing policy were a subject for mandatory bargaining, such bargaining has already occurred. AFSCME has not challenged IDOC's right to install a drug-testing policy. After IDOC announced its intent to have drug testing, AFSCME and the State parties met four times in January

and February of 1988. During those sessions, they negotiated many aspects of a drug-testing policy, including details about the urine sampling itself. The parties have not finished bargaining. The important topic still on the table is the problem of discipline for employees who refuse to test or who test positive. However, bargaining over the kind of policy and basics of testing has already been completed.

The next aspect of the first issue is whether ISLRB was incorrect in using a balancing test to weigh the unilateral managerial policies allowed in section 4 against the duty to bargain mandated in section 7. In its analysis, ISLRB did not simply find that introduction of drug testing could be a management right exempt from the manager's duty to bargain. Instead, ISLRB first determined that the drug policy did, indeed, affect terms and conditions of employment. After making this determination, ISLRB weighed the employer's interests in having such a program against its effects on employees.

On the Federal level, the Supreme Court has approved the NLRB's use of a balance test to resolve private-sector disputes about management prerogatives and the duty to bargain. (*First National Maintenance*, 452 U.S. at 686-87, 69 L. Ed. 2d at 335-36, 101 S. Ct. at 2584-85.) In *First National Maintenance*, the Court acknowledged that a private employer's decision to close a business would have a pronounced effect on the employees' work lives. Even so, the employer did not have to bargain on this particular subject unless the benefits of bargaining for employees outweighed the burdens placed on the conduct of the business. *First National Maintenance*, 452 U.S. at 679, 69 L. Ed. 2d at 331, 101 S. Ct. at 2581.

■ Labor boards in Illinois now routinely use a balance test to weigh the duty to bargain against management rights. Recently the fourth district approved this use in a dispute that involved some statutory language in the Illinois Educational Labor Relations Act which is nearly identical to the language here. (*Decatur*, 180 Ill. App. 3d 770, 536 N.E.2d 743.) First, the court distinguished between employer policies with a direct or indirect impact on the work force. Since all management decisions have some impact, a liberal interpretation of direct impact would leave management with no unilateral rights at all. (*Decatur*, 180 Ill. App. 3d at 773, 536 N.E.2d at 745.) But even if some policy has a direct affect, it is not automatically the subject of mandatory bargaining because of the great overlap between rules that affect workers and policies that promote management rights. (*Decatur*, 180 Ill. App. 3d at 773, 779-81, 536 N.E.2d at 745, 749-50.) When direct impact on workers overlaps with management rights, labor boards should use their expertise to determine

whose interests are more at risk. *Decatur*, 180 Ill. App. 3d at 775-77, 536 N.E.2d at 746-48.

In this case, the ISLRB acknowledged strong employee interests. Under the new policy, "suspicious" employees would suffer the indignity of urine tests. Employees who tested positive would face discipline. Thus an employee might suffer sanctions on the job simply because he used drugs in his private time.

On the other side, ISLRB noted a severe security problem involving employee drug traffic at the State prisons. Prison officials are required by law to provide a secure environment for both inmates and employees. (Ill. Rev. Stat. 1987, ch. 38, par. 1003—7—4.) Toward that end, they have instituted numerous measures: the canine sniffs, the pat-down and strip searches, all to control the flow of drugs. In spite of these measures, officials continue to find drugs in the prison and drug use, including overdoses, among inmates. As of spring 1988, Corrections officials were investigating 217 employees for possible drug dealing at prison facilities. The new drug policy, ISLRB found, is one more measure designed to control criminal activity by employees at the prisons.

■ We find that both the hearing officer and the Board itself properly considered these factual matters and properly weighed the balance in favor of management rights. We further find that, given the need for some security at the prison, the decision to install new drug-testing measures at the prison might fall outside of mandatory bargaining on the grounds that bargaining will not resolve management's need to control the security risks attendant with the drug traffic between inmates and employees. For these reasons, we affirm ISLRB's use of a balance test and ISLRB's decision that the management interest in drug testing outweighed the employees' interest in bargaining over whether such testing would occur.

■ Regardless of whether IDOC must bargain on the topic of introducing a drug policy, however, it must still negotiate "with regard to policy matters directly affecting wages, hours and terms and conditions of employment as well as the impact thereon." (Ill. Rev. Stat. 1987, ch. 48, par. 1604.) If the new policy includes disciplinary sanctions, these sanctions are mandatory subjects of bargaining. (*City of East St. Louis*, 3 Pub. Employee Rep. (Ill.) par. 2011 No. S—CA—274 (ISLRB January 7, 1987).) Parties do not need endless discussion, but they should make a good-faith effort to reach agreement. *National Labor Relations Board v. American National Insurance Co.* (1952), 343 U.S. 395, 404, 96 L. Ed. 1027, 1037, 72 S. Ct. 824, 829.

In this case, the parties have already bargained successfully about all of the policy effects except discipline for employees who refuse to take the test or who test positive. ISLRB did not find that the parties had reached an impasse on this topic. Given the many topics which IDOC, CMS and AFSCME had covered in four sessions, it seems likely they could still expect results if they spent more time on this remaining effect. Therefore, ISLRB ordered parties to return to the table and continue talking about the subject of employee discipline.

We believe that ISLRB's decision that parties could reach some bargain through continued discussions about employee discipline is a reasonable one. For this reason, we affirm the ISLRB order for further bargaining on that topic.

AFSCME's second issue on appeal is that the ISLRB made an unreasonable finding of fact when it decided CMS had not waived the right to bargain about or institute a drug-testing program for the duration of the contract. During contract negotiations, CMS first proposed, then withdrew, a drug-testing program. CMS later agreed to the waiver clause in the master agreement. Since AFSCME considers drug testing a subject for mandatory bargaining, this petitioner now argues that CMS waived the right to bargain. Respondents, who do not consider drug testing a subject for mandatory bargaining, now argue that CMS did not waive either the right to bargain or the right to institute the program without bargaining.

■ A party does not waive rights in a labor negotiation unless the waiver is "clear and unequivocal." (*Rockwell International Corp.* (1982), 260 NLRB Dec. (CCH) par. 1346, 1347, 109 LRRM (BNA) 1366, 1367.) So too, the evidence that a party in a labor negotiation intended to waive a statutory right must be clear and unmistakable. (*Village of Oak Park v. Illinois State Labor Relations Board* (1988), 168 Ill. App. 3d 7, 20-21, 522 N.E.2d 161, 169.) When parties sign a document so they can reach some necessary agreement, this action is not clear evidence that they relinquish rights to fix other terms later. *Village of Oak Park*, 168 Ill. App. 3d at 20-21, 522 N.E.2d at 169.

ISLRB and the parties here all agree on this legal standard, but they differ on what facts do constitute a clear and unmistakable waiver. Indeed, the standard for these facts has also varied with different State jurisdictions and with different membership on the National Labor Relations Board. (See *East Richland*, 173 Ill. App. 3d at 891-907, 528 N.E.2d at 758-68.) *Radioear Corp.* (1972), 199 NLRB Dec. (CCH) par. 1161, 81 LRRM (BNA) 1402, which is cited by the plaintiff, started the NLRB trend toward the acceptance of waivers without explicit language about a specific right. But many jurisdic-

tions still prefer explicit language that identifies the subject of the waiver. *East Richland,* 173 Ill. App. 3d at 891-907, 527 N.E.2d at 758-68.

Thus, ISLRB had to decide whether the facts of this case constitute a clear and unmistakable waiver even though the contract waiver or zipper clause never mentioned either drug testing or, more generally, items dropped during negotiations. Once the ISLRB decides the legal effect of facts, the ISLRB's decision must be upheld if it is reasonable and consistent with the statute and supported by substantial evidence. *Rockford Township Highway Department v. Illinois State Labor Relations Board* (1987), 153 Ill. App. 3d 863, 875, 506 N.E.2d 390, 397.

AFSCME cites a case where language "remarkably similar" to the language here precluded mid-term bargaining. However, the case cited by the AFSCME, *American League of Professional Baseball Clubs,* does not appear in the research materials. Furthermore, the number cited, 99 LRRM 1724, belongs to a case on retaliatory discharge, and not contract waiver.

During negotiations for their contract agreement, the parties had discussed possible drug testing (blood and urine) for nearly 37,000 State employees. Then CMS withdrew its request. The reasons for withdrawal and any possible bargaining for that move are not reflected in the record. Furthermore, the parties did not allude to this bargaining in the zipper clause, article XXXIV, section 4, of their agreement. Instead, the parties acknowledged that each side had ample chance to propose terms "and that the understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement."

By contrast, cases which have found implicit waiver in zipper clauses have relied on more specific language. *Radioear Corp.,* for instance, ruled on a zipper clause in which the union had agreed "that the Company shall not be obligated to bargain collectively with respect to any subject or matter not specifically referred to or covered in this agreement." (*Radioear Corp.,* 199 NLRB Dec. (CCH) par. 1161, 1162, 81 LRRM (BNA) 1402, 1403.) The clause here states that all agreements actually made are covered by the agreement. Unlike the *Radioear Corp.* clause, this one does not exclude all topics not covered by the agreement. For these reasons, when ISLRB reviewed the clause here, it did not find a clear and unmistakable waiver.

■ In this case, ISLRB looked for waiver by reviewing the history of contract negotiations and the zipper clause in the final agree-

ment. Given this bargaining history and language, ISLRB did not find the zipper clause to be a clear statement of waiver for all topics discussed but not settled during negotiations.

We find the ISLRB holding that no waiver occurred is supported by substantial evidence. Therefore, we affirm the ISLRB ruling that CMS and IDOC had not waived their right to bargain over or institute drug testing during the contract term.

Affirmed.

EGAN, P.J., and McNAMARA, J., concur.