THE CITY OF BELVIDERE, Petitioner-Appellant, v. ILLINOIS STATE LABOR RELATIONS BOARD *et al.*, Respondents-Appellees.

Second District    No. 2—95—1540

Opinion filed September 5, 1996.—Rehearing denied October 9, 1996.

Roberta L. Holzwarth, of Holmstrom & Kennedy, of Rockford, for petitioner.

James E. Ryan, Attorney General, and Jacalyn J. Zimmerman, of Illinois State Labor Relations Board, both of Chicago (Barbara A. Preiner, Solicitor General, and A. Benjamin Goldgar, Assistant Attorney General, of counsel), for respondents Manny Hoffman, Robert M. Healey, Robert J. Hilliard, and Illinois State Labor Relations Board.

Gilbert Feldman, of Cornfield & Feldman, of Chicago, for respondent Belvidere Professional Firefighters Association, Local 1569.

JUSTICE DOYLE delivered the opinion of the court:

The City of Belvidere, Illinois (City), appeals from a decision and order of the Illinois State Labor Relations Board (Board) in favor of the Belvidere Professional Firefighters Association, Local 1569, IAFF (Union). The Board decided that the City's refusal to bargain with

the Union over the City's decision to contract with a private ambulance company to provide paramedic services in the City was an unfair labor practice because the matter was a mandatory subject of collective bargaining. The Board ordered the City to rescind the contract and engage in collective bargaining with the Union. On appeal, the City contends that the Board erred when it determined that the City's decision was a mandatory subject of collective bargaining.

We allowed, in part, the City's motion to stay the Board's order pending the outcome of this appeal. We stayed the portion of the order requiring the City to rescind the contract with the private ambulance company.

## Background

Since January 6, 1992, the Union has been the exclusive bargaining agent for the City's 15 firefighters. Prior to January 6, 1992, the Belvidere City Employees' Association (BCEA) represented the firefighters.

Since 1974, one function of the Belvidere fire department (fire department) has been to provide emergency medical services (EMS) to residents of Belvidere. The Emergency Medical Services (EMS) Systems Act (EMS Act) (210 ILCS 50/1 et seq. (West 1994)) governs the provision of EMS in Illinois. Under the EMS Act, the Illinois Department of Public Health (Department) has the authority and responsibility to certify and license individuals to provide EMS. 210 ILCS 50/10 (West 1994).

The EMS Act sets out three levels of licensing for individuals performing EMS. The three licensing levels have different education, training, and testing requirements.

The lowest level of certification is Emergency Medical Technician—Ambulance (EMT—A). 210 ILCS 50/4.12 (West 1994). Effective July 19, 1995, the EMT—A designation was changed to EMT—B (Basic). 210 ILCS Ann. 50/3.50 (Smith-Hurd Supp. 1996). We will continue to use EMT—A because that designation was in effect during the time material to this appeal. An EMT—A may perform basic life support (BLS) services, such as airway management, cardiopulmonary resuscitation, control of shock and bleeding, and splinting of fractures.

An intermediate level of certification is Emergency Medical Technician—Intermediate (EMT—I). 210 ILCS 50/4.15 (West 1994). An EMT—I may perform BLS services and certain advanced life support (ALS) services.

The highest level of certification is Emergency Medical Technician—Paramedic (EMT—P or paramedic). 210 ILCS 50/4.13 (West

1994). An EMT—P may perform ALS services, which include all BLS services plus cardiac monitoring, cardiac defibrillation, electrocardiography, administration of antiarrhythmic agents, intravenous therapy, administration of medications, drugs and solutions, use of adjunctive medical devices, trauma care, and other authorized techniques and procedures.

The Department also has the responsibility for licensing and setting standards for the operation of ambulances. The Department licenses ambulances at three levels of service. These levels are: BLS; intermediate life support (ILS); and ALS.

Every ambulance must be staffed with at least two EMTs. An ILS ambulance must be staffed at all times with at least one EMT—I. An ALS ambulance must be staffed at all times with at least one paramedic.

The City purchased its first ambulance and began providing EMS through its fire department in 1974. By 1976, the City required its firefighters, as a condition of employment, to become certified medical technicians at the EMT—A level. Eventually, through attrition and training, all of the City's firefighters became EMT—As. In 1980, the City acquired and began operating a second ambulance.

In the late 1980s, several of the City's firefighters began training as EMT—Is. By January 1, 1990, six firefighters had received EMT—I certification, and the City began operating one of its ambulances at the ILS level.

Throughout this time period, when the City received a 911 call, the fire department ambulances had dispatch priority. This meant that in response to a 911 call the dispatcher would send a fire department ambulance staffed with two firefighter/EMTs to the scene. At the discretion of the shift commander on duty, an engine manned by two or three additional firefighter/EMTs might also be dispatched to the call. Only if the caller specifically requested a private ambulance was a private ambulance dispatched. The City occasionally requested backup assistance from private ambulance companies when, for example, calls came in while the City's ambulances were already in service or when additional emergency medical personnel were needed. On those occasions, the City's firefighter/EMTs worked alongside the paramedics from the ambulance companies to provide EMS.

In 1989 or early in 1990, the City required three probationary firefighters to sign individual agreements that, as a condition of their employment, they would become licensed and certified as either an EMT—I or EMT—P. The BCEA subsequently filed a grievance protesting the imposition of this requirement. The matter was

resolved when the City removed the individual agreements from the firefighters' personnel files. However, the City asserted that it had the right to require new firefighters to undergo EMT—P training and assume EMT—P assignments.

In 1990, during negotiations for a new collective bargaining agreement, the City and the BCEA discussed proposals for a paramedic program within the fire department. The parties were unable to reach agreement as to such a program, and a program was not implemented.

In 1991, two firefighters downgraded their certification from EMT—I to EMT—A. This left the fire department with only four EMT—Is. Four EMT—Is was an insufficient number to man the fire department's ILS ambulance around the clock without excessive overtime. Consequently, the City subsequently downgraded the status of its ILS ambulance to the BLS level pending installation of a paramedic program.

On May 13, 1991, the City council's public safety committee created an *ad hoc* committee to discuss the feasibility of turning over the City's ambulance service to an outside party. The *ad hoc* committee consisted of the mayor, the fire chief, two city council members, a BCEA representative, and two citizens at large.

The *ad hoc* committee met periodically from June 26, 1991, through October 8, 1991. The committee gathered information regarding EMS from 32 communities that were comparable in size to Belvidere. The committee also sent a questionnaire to 10 private ambulance companies requesting information regarding the level and scope of services the companies offered and background information.

During this period, the fire department submitted a document to the committee. The document urged the City to provide paramedic services through the fire department and analyzed the projected costs involved.

On October 9, 1991, the *ad hoc* committee submitted its recommendations to the public safety committee. The recommendations were:

"(1.) The city's level of EMS needs to be upgraded to paramedic level.

(2.) User fees need to more closely reflect the actual cost of offering this service. It is recommended that the city increase the ambulance charge in line with this goal.

(3.) That any firefighter hired after August 1989, is subject to a requirement of attaining paramedic certification, should the city institute the program. At a minimum, this should be set out by Resolution.

(4.) One of the options may be privatization of EMS. Four private companies have expressed interest in performing the service. Cost data for this option can only be supplied if the city assembles bid specifications for the service that is wanted. The Ad Hoc Committee could assist in this task.

(5.) A proposal has been received from the Belvidere firefighters to offer this service in-house. The terms, conditions, and cost will need to be set out in a future contract, and should be recommended to negotiators.

(6.) That the city can require paramedic certification as a pre-employment requirement. This should be set out in an ordinance to take effect for all firefighters hired after December 29, 1991.

(7.) That the only way to compare the merits of findings (4) and (5) is to prepare bidding specifications and formally submit them to the four private EMS companies; Lifeline, Public Safety Services, Metro, and A-Tec. The results can then be compared with the costs of findings(s)."

On October 14, 1991, the public safety committee considered the *ad hoc* committee's recommendations. The public safety committee decided to prepare bid specifications for private ambulance service with paramedics.

In January 1992, the City prepared and sent its specifications to four private ambulance companies. All four ambulance companies responded; however, three of the companies declined to submit proposals. Only one company, Lifeline Ambulance (Lifeline), indicated that the City's specifications were generally acceptable with certain items negotiable.

The Union also submitted a response to the bid specifications. The Union's response consisted of the analysis it had previously submitted to the *ad hoc* committee and additional material aimed at persuading the City to use firefighters as paramedics.

On January 21, 1992, the public safety committee met as a committee of the whole City council. The council reviewed the response to the bid specifications. In a 7 to 3 vote, the council voted against a motion "to honor our prior resolution agreement with the Firefighters by addressing the paramedic issue in negotiations prior to implementing anything within the City."

In 1992, the City and the Union negotiated a new collective bargaining agreement. At that time, the parties discussed proposals for a paramedic program within the fire department. The parties were unable to reach agreement regarding such a program, and none was implemented.

On January 14, 1993, the fire chief sent a letter to the finance and personnel committee of the City council. The letter stated that

the Union had decided to take it upon itself to begin paramedic training on January 18, 1993. In the letter, the chief opined that it would be preferable if the City and the firefighters were in agreement on such training and suggested that the contract be reopened to discuss the issue.

In the spring of 1993, at the City council's request, the chief prepared another analysis of the costs to upgrade the fire department's EMS program to paramedic level. The chief estimated that the initial costs would range from $78,000 to $247,000, and ongoing costs would range from $20,000 to $127,000 annually.

Shortly after the chief submitted his analysis, the City resolicited bids from private ambulance companies to upgrade the City's ambulance service. The City advised the Union of its resolicitation of bids by sending the Union a copy of the bid solicitation.

A series of letters between the Union and the City followed. The Union took the position that the bid solicitation was an invitation to modify the contract between the Union and the City. The Union requested collective bargaining over the issue. The City declined to bargain. In a letter dated August 26, 1993, the City stated that it did "not have a duty to bargain over the decision to contract paramedic services within the City limits under the circumstances presented."

On September 7, 1993, the City authorized the preparation of an agreement with Lifeline to provide paramedic ambulance services. The City subsequently approved the agreement with Lifeline.

In a letter dated September 8, 1993, the Union demanded collective bargaining over the "effects of the City contracting out bargaining unit work." In a letter dated September 9, 1993, the City agreed to enter into bargaining over the effects of the City's decision. However, the City's refusal to bargain over the decision itself has continued since August 26, 1993.

On September 13, 1993, the Union filed an unfair labor practice charge with the Board. The basis of the Union's charge was the City's refusal to bargain over its decision to contract out paramedic services. The Board subsequently issued a complaint for a hearing.

On May 2, 1994, an administrative law judge (ALJ) conducted a hearing on the Union's charge. On March 16, 1995, the ALJ issued a recommended decision and order, ruling that the City's decision was not a mandatory subject of collective bargaining. On April 13, 1995, the Union filed exceptions to the ALJ's recommendations.

On June 26, 1995, the Board heard oral arguments on the matter. On November 2, 1995, the Board issued a decision and order. The Board adopted the ALJ's findings of fact but reversed the ALJ's conclusion by deciding that the City's decision was a mandatory subject of collective bargaining. The City's timely appeal followed.

## Analysis

■ Judicial review of a decision by the Board extends to all questions of law and fact presented by the record, and the Board's findings of fact are deemed *prima facie* true and correct. *City of Freeport v. Illinois State Labor Relations Board*, 135 Ill. 2d 499, 507 (1990). The Board's determinations of questions of law are not entitled to the same deference as its findings of fact. *City of Freeport*, 135 Ill. 2d at 507. Nonetheless, a reviewing court should give substantial deference to the Board's interpretation of a statute which it administers and enforces, unless the Board's interpretation is clearly wrong. *City of Freeport*, 135 Ill. 2d at 516.

■ The question before us in this appeal is whether the Board erred when it decided that the City's refusal to engage in collective bargaining with the Union over the City's decision to contract out paramedic services was an unfair labor practice which violated the Illinois Public Labor Relations Act (Act) (5 ILCS 315/1 *et seq.* (West 1994)). Section 10(a)(4) of the Act makes it an unfair labor practice for a public employer to refuse to bargain collectively in good faith with a labor organization which is the exclusive representative of public employees in an appropriate unit. 5 ILCS 315/10(a)(4) (West 1994).

■ Section 7 of the Act imposes a duty on a public employer to engage in good-faith collective bargaining with its employees' exclusive representative "with respect to wages, hours, and other conditions of employment, not excluded by Section 4" of the Act. 5 ILCS 315/7 (West 1994). Section 4 states, in relevant part:

"Employers shall not be required to bargain over matters of inherent managerial policy, which shall include such areas of discretion or policy as the functions of the employer, standards of services, its overall budget, the organizational structure and selection of new employees, examination techniques and direction of employees. Employers, however, shall be required to bargain collectively with regard to policy matters directly affecting wages, hours and terms and conditions of employment as well as the impact thereon upon request by employee representatives." 5 ILCS 315/4 (West 1994).

■ In *Central City Education Ass'n v. Illinois Educational Labor Relations Board*, 149 Ill. 2d 496 (1992), our supreme court addressed sections of the Illinois Educational Labor Relations Act (115 ILCS 5/1 *et seq.* (West 1994)) which contained language similar to sections 4 and 7 of the Act. The court set out a three-part test to determine whether an issue is a mandatory subject of collective bargaining as follows:

"The first part of the test requires a determination of whether the matter is one of wages, hours and terms and conditions of employment. This is a question that the [Board] is uniquely qualified to answer, given its experience and understanding of bargaining in *** labor relations. If the answer to this question is no, the inquiry ends and the employer is under no duty to bargain.

If the answer to the first question is yes, then the second question is asked: Is the matter also one of inherent managerial authority? If the answer to the second question is no, then the analysis stops and the matter is a mandatory subject of bargaining. If the answer is yes, then *** the matter is within the inherent managerial authority of the employer and it also affects wages, hours and terms and conditions of employment.

At this point in the analysis, the [Board] should balance the benefits that bargaining will have on the decisionmaking [*sic*] process with the burdens that bargaining imposes on the employer's authority. Which issues are mandatory, and which are not, will be very fact-specific questions, which the [Board] is eminently qualified to resolve." *Central City*, 149 Ill. 2d at 523.

■ This case involves a charge that the City unilaterally contracted out unit work without engaging in collective bargaining. In such cases, when making the determination required by the first part of the *Central City* test, an administrative agency should apply the criteria set out in *Westinghouse Electric Corp.*, 150 NLRB 1574 (1965). *Fenton Community High School District 100*, 5 Pub. Employee Rep. (Ill.) par. 1004, No. 87—CA—0009—C (IELRB, November 29, 1988). The *Westinghouse* criteria are whether the contracting out (1) involved a departure from previously established operating practices; (2) effected a change in the conditions of employment; or (3) resulted in a significant impairment of job tenure, employment security, or reasonably anticipated work opportunities for those in the bargaining unit. *Westinghouse*, 150 NLRB at 1576.

In this case, both the ALJ and the Board applied the *Westinghouse* criteria in making the determination required by the first part of the *Central City* test. The ALJ summarily found that the Board's decision was not a matter which implicated either of the first two *Westinghouse* criteria. The ALJ then evaluated the third *Westinghouse* criterion. The ALJ stated that the crucial question in determining whether an employer's decision to contract out work gave rise to a duty to bargain under this criterion was whether the employer's action deprived the bargaining unit of "fairly claimable work opportunities." The ALJ found that the paramedic work in this case was not bargaining unit work which the firefighters had a reasonable expectation would be assigned to them. The ALJ gave substantial

weight to the fact that the City had not previously provided paramedic services and that the firefighters were not qualified by certification to perform paramedic work. Thus, the ALJ determined that the City's decision did not implicate any of the *Westinghouse* criteria.

Contrary to the ALJ, the Board found that the City's decision implicated each of the *Westinghouse* criteria. As to the first *Westinghouse* criterion, whether the City's decision was a departure from previously established operating practices, the Board focused on the way dispatchers handled 911 calls for EMS before and after the City contracted out the work. The Board determined that the City's decision caused the firefighters to lose the responsibility for providing the first-line response to 911 calls for EMS. The Board concluded that this was a significant change in operating practices.

In applying the second *Westinghouse* criterion, whether there was a change in the conditions of employment, the Board noted that as a result of the City's decision the firefighters responded to fewer EMS calls and performed fewer EMS duties than before the City's decision. The Board concluded that this showed a demonstrable adverse change in the working conditions of the firefighters, notwithstanding the fact that no firefighter had been laid off or discharged as a result of the City's decision.

The Board strongly disagreed with the ALJ regarding the third *Westinghouse* criterion, whether the City's decision resulted in a significant impairment of the firefighters' reasonably anticipated opportunities. The Board focused on the ALJ's reliance on the fact that the firefighters lacked the requisite training and certification to perform paramedic services and, therefore, could not perform the paramedic services without substantial additional training.

In finding that the work was fairly claimable by the firefighters, the Board first determined that the City itself had viewed the paramedic work as a reasonable extension of the firefighters' duties as evidenced by the City's various attempts to come to terms with the firefighters on the matter. The Board next determined that the City had previously requested its firefighters to attain certain levels of EMT certification and had paid for the training necessary for the firefighters to attain the requisite certification. The Board also stated that the EMT certification levels build upon one another and require advancing skills so that the paramedic services were really an upgraded or enhanced service, rather than a completely new program.

On appeal, the City generally contends that the Board used too liberal a standard in applying the first part of the *Central City* test.

In the City's view, the ALJ's analysis was correct. More specifically, the City posits that the Board incorrectly applied the *Westinghouse* criteria.

As to the first *Westinghouse* criterion, the City essentially maintains that there has effectively been no change in previously established operating procedures. The City argues that (1) the fire-department and private ambulance companies always shared the provision of EMS and that has not changed; (2) the firefighters' procedures are essentially unchanged in that the firefighters continue to respond to all serious EMS calls; (3) nothing has changed as to the provision of paramedic services because private companies previously provided those services; and (4) the City has always made unilateral decisions regarding the provision of EMS and simply continued to do so when it decided to contract out the paramedic services.

The Board responds that the evidence shows that the City did not make a practice of unilaterally deciding about EMS. The Board points to the history of the relation between the City and the firefighters and the periodic discussions between those parties on this matter. The Board also notes that the record shows that the City did not previously contract with private companies and argues that the City's decision to contract with Lifeline was therefore a change in procedure. Finally, the Board reiterates its conclusion that because the firefighters no longer are given the first priority in responding to calls for EMS there has been a change in operating procedures.

■ We disagree with the Board's determination that the City's decision constituted a departure from previously established operating procedures and conclude that the Board's determination was clearly wrong.

The Board's determination ignored the fact that prior to the City's decision to contract with Lifeline for paramedic services the fire department and private ambulance companies always cooperated with each other and shared the duties of providing EMS. The City's decision has not changed this basic operating procedure.

Private ambulance companies have always provided, both before and after the City's decision, paramedic services in the City. The fire department has never provided paramedic services. Under the contract, the fire department will continue to provide EMS. The contract provides that Lifeline must request assistance from the fire department on certain types of emergency calls, including those · involving cardiac or respiratory emergencies, trauma, and all motor vehicle accidents.

In view of this continuing basic operating procedure, we believe

the Board focused on relatively inconsequential changes in making its determination regarding the first *Westinghouse* criterion. For this reason, we conclude that the Board erred when it determined that the first *Westinghouse* criterion was applicable to this case.

■ As to the second *Westinghouse* criterion, the City contends that the Board's determination that the City's decision effected a change in the firefighters' conditions of employment was erroneous because the firefighters continued to perform most of the same EMS that they performed before the City's decision. The City concedes that the firefighters no longer respond to calls which merely require transportation in an ambulance, but dismiss this change because such calls only constituted a small percentage of the calls to which the firefighters previously responded.

The record is unclear as to the exact number and type of calls to which the firefighters no longer respond. However, the record is clear that the City's decision has not resulted in the elimination of any firefighter positions or in a reduction in working hours or wages for any firefighter. Moreover, the firefighters generally continue to work the same shifts that they worked before the City's decision. While at work, the firefighters continue to respond to calls for EMS and continue to provide basic life support services when called.

On this record, we conclude that the Board's determination that there was a significant change in conditions of employment as a result of the City's decision was clearly wrong. Accordingly, the Board was not entitled to determine that the second *Westinghouse* criterion applied in this case.·

As to the third *Westinghouse* criterion, the City contends that the Board's determination was erroneous because of the qualitative differences between paramedic services and the EMS which the firefighters currently perform. In the City's view, the firefighters could not have had a reasonable expectation of performing the paramedic work because they were not legally qualified to perform such work. The City asserts that the Board erred in determining that paramedic services were merely an upgrade of the services the firefighters were performing prior to the City's decision. The City argues that its discussion with the firefighters about training the firefighters to become paramedics is not a valid basis for the Board's determination. The City maintains that it always made it clear to the firefighters that it might contract out the work.

The Board responds that the firefighters had a reasonable anticipation of work opportunities as paramedics because (1) the firefighters had been performing EMS since 1974; (2) paramedic work is not wholly different or completely new work for the firefighters, but

simply an upgraded level of EMS; and (3) the City itself considered the paramedic services to be an upgrade as evidenced by the discussions the City held and serious consideration the City gave to using the firefighters as paramedics.

■ Again, the Board's determination was clearly wrong. Although it is true that the City's firefighters have been performing EMS since 1974, it is also true that the firefighters have never performed paramedic services and that they lack the required training and licensure to perform paramedic services. Thus, the City did not contract out work that the firefighters had previously performed or that they were capable of performing. At a minimum, extensive training of virtually all the firefighters over many months would be necessary to train the firefighters so that they could perform paramedic services. This would necessarily entail a significant upset to the status quo in the operation of the City's fire department.

Nor are we persuaded that paramedic work is simply an upgrade or extension of the EMS work the firefighters have been performing. Most of the firefighters are EMT—As. Two firefighters who had attained EMT—I licenses voluntarily downgraded themselves back to EMT—A. The chasm between an EMT—A and a paramedic is substantial. An EMT—A may only perform the most basic life support functions. A paramedic may perform advanced life support functions involving several procedures that an EMT—A is not qualified to perform. Paramedics often perform these procedures in the treatment of real or potential acute life-threatening conditions. Thus, paramedic work is qualitatively different from and completely new from EMT—A work, the work that the firefighters have been performing.

■ Finally, the fact that the City held discussions with the Union or BCEA about training the firefighters to be paramedics does not mean that the City considered paramedic services to be merely an upgrade of the EMT—A services the firefighters had been performing. The City made it clear that it was also considering continuing to use a private company to provide the services. The mere fact that a party proposes or discusses an issue does not make the issue a mandatory subject of collective bargaining. *American Federation of State, County & Municipal Employees v. Illinois State Labor Relations Board*, 190 Ill. App. 3d 259, 269 (1989).

Based on the foregoing, we conclude that the Board erred when it determined that each of the *Westinghouse* criteria was applicable in this case. Accordingly, the Board erred when it found that the answer to the first part of the *Central City* test was "yes," *i.e.*, that the City's

decision was a matter of wages, hours, and terms and conditions of employment. The correct answer was "no."

Because the correct answer to the first part of the *Central City* test was "no," the Board should have ended its inquiry at that point. *Central City*, 149 Ill. 2d at 523. For the same reason, the Board should have determined that the City did not have a duty to bargain with the Union over the City's decision to contract out for paramedic services.

Based on the foregoing, we conclude that the Board erred when it determined that under the *Central City* test the City's decision was a mandatory subject of collective bargaining.

Accordingly, the Board's decision and order is reversed.

Reversed.

INGLIS and BOWMAN, JJ., concur.